**Butler v. Provident Mutual Life Insurance Co.**

C.P. of Philadelphia County, no. 9901-0780.

*Kenneth H. Jacobsen,* for plaintiffs.
*Laurence Z. Shiekman,* for defendants.

LEVIN, *J.,* September 16, 1999—Before this court are plaintiffs' motion for permanent injunction and all responses thereto, The court held a full hearing on the merits of plaintiffs' motion on June 22, 1999. Under Pa.R.C.P 1517, the court's statement of the issues, findings of fact, discussion of questions of law, conclusions of law, and decree nisi follow.[1]

---

1. Rule 1517 no longer requires numerated findings of law and fact. *Purdy v. Zaver,* 398 Pa. Super. 190, 196, 580 A.2d 1127, 1130 (1990). Therefore, the following adjudication and discussion will be in narrative form.

## INTRODUCTION

On January 11, 1999, plaintiffs, policyholders of Provident Mutual Insurance Company, filed a class action complaint against Provident on behalf of themselves and all other Provident policyholders containing six counts[2] and prayers for declaratory, injunctive and monetary relief. Plaintiffs' complaint arises out of Provident's decision to convert from a mutual insurer to a stock insurer.[3] Under the plan of conversion, policyholders' membership rights[4] "will be exchanged for membership rights in Provident Mutual Holding Company" while policyhold-

---

2. The six counts are: I. Fundamental unfairness; II. Unfair self-dealing; III. Failure to provide dissenters' rights; IV. Failure to disclose dissenters' rights; V. Violation of duty of disclosure; and VI. Misrepresentation.

3. Under Provident's plan of conversion, Provident Mutual converts from a single mutual insurer corporation to three interrelated corporations. These three corporations are: (1) a holding company (entitled Provident Mutual Holding Company and purportedly a Pennsylvania nonstock corporation); (2) a stock corporation (entitled Prov*first* American Corporation and purportedly a Pennsylvania stock corporation); and (3) a stock life insurance company (entitled Prov*first* American Life Insurance Company and purportedly a Pennsylvania stock life insurance company).

The stock corporation, Prov*first* American Insurance Corporation, will own *all* the voting stock of the stock life insurance company, Prov*first* American Life Insurance Company, thereby becoming a subsidiary of Provident Mutual Holding Company. The holding company will own at least a majority of the voting stock of the stock corporation. The minority voting authority of the stock corporation will be vested in the shareholders of Prov*first* Life. (Policyholder information statement at 8.)

4. According to Provident, membership rights include the right to vote, and the right to any surplus which would remain after insolvency, winding up or liquidation of Provident Mutual. (*Id.* at 12.)

ers' contract rights[5] will be held in the stock life insurance company. (Policyholder information statement at 12.)

## I. *Statement of the Issues*

The court must decide two issues. First, whether Provident is required to provide policyholders with dissenters' rights, whereby policyholders can obtain the fair value of their membership interests in Provident. Second, whether to permanently enjoin Provident from effectuating the plan of conversion because the policyholder information statement Provident provided to policyholders did not enable the policyholders to make an informed vote on the plan. After the findings of fact, the court will discuss the law of permanent injunctions, state its conclusion to permanently enjoin Provident's plan of conversion and then address each of these issues.

## II. *Findings of Fact*

To persuade people to purchase its life insurance policies, Provident told its agents to tell prospective policyholders that: "[a] mutual life insurance company is one that is owned and operated by and for the benefit of its policyowners. 'Profits' are returned to policyowners in the form of policy dividends." (Pls.' exhibit 16 at 12, Provident Mutual sales presentation system.) Provident backed its sales pitch with a "vision statement." In 1995, Provident stated that its "vision" was that "[a]s a mutual company, Provident Mutual Life Insurance Company is

---

5. Provident defines contract rights as the right to receive benefits as specified in members' policies or contracts and the right to dividends. (*Id.*)

owned by its participating individual policyholders.[6] All company affairs are managed in their best interest—to maximize the value of their relationship with us." (Pls.' exhibit 5-C, Provident Mutual strategic plan, Oct. 1995 at 2.) Provident described participating policyholders as "shar[ing] in some degree in the fortunes of the firm, positive or negative. Participating customers have some but not all incidents of ownership." (Pls.' exhibit 19, A proposed statement of the financial goal of the Provident Mutual fleet, July 11, 1986 at 1.) Provident distinguished participating from nonparticipating policyowners by stating that "the profits (and losses) from the nonparticipating lines are considered to belong to the participating policyholders." (*Id.*)

Consistent with that distinction, Provident began awarding participating policyholders a "performance dividend" in 1987. (Pls.' exhibit 13 at 2, August 1, 1989, memo from Alan Hinkle to members of dividend committee of the board of directors.) Provident used profits from nonparticipating lines of business to pay these dividends. (*Id.*) It was also "[Provident's] policy to pay these dividends out of accumulated surplus over a five-year period." (*Id.*) Provident paid performance dividends for three reasons: (1) To pay out accumulated surplus to

6. A person can be a participating policyowner even if they do not receive a dividend. For example, variable life contract holders are considered participating policyholders even though they do not receive a dividend. (See March 16, 1999 Notes of Testimony at 130.) However, the parties presented no evidence to show that a person can be a nonparticipating policyholder if she receives a dividend. In addition, nonparticipating policyholders do not have the right to vote on corporate actions. (Notes of Testimony, March 16, 1999 at 137-38.) Therefore, the court refers to participating policyowners as persons who have both the right to receive dividends and the right to vote.

policyholders; (2) to return to owners of the corporation profits from nonparticipating lines of business; and (3) to improve the competitiveness of individual life products in a declining interest rate environment. (*Id.*) In 1989, when Provident was considering eliminating performance dividends, then-assistant vice-president and actuary, Alan Hinkle, was concerned:

"If performance dividends are eliminated, how will participating policyholders receive the benefit of their investment in nonpar lines of business. These lines will be providing capital for growth, but growth of which lines? What if the desired growth does not occur? How long should these policyholders fund rapid growth? I would prefer that performance dividends be reduced or temporarily suspended, but not eliminated. The mechanism should be in place to eventually begin paying back the policyholders for funding this growth." (Pls.' exhibit 14, memorandum from Alan F. Hinkle to John McClelland dated May 25, 1989.)

Despite Mr. Hinkle's concerns, Provident eventually eliminated performance dividends, and beginning in 1995, began considering alternative corporate structures for Provident. By January of 1998, Provident's board of directors had approved a plan to convert to a mutual holding company corporate structure. (Aff. Robert Kloss at ¶2; pls.' exhibit 5-bb, minutes of January 5, 1998 board of directors meeting.) Provident's "mission" and "vision" changed accordingly. By March of 1998, Provident no longer stated that its "vision" was that all company affairs be managed in participating policyholders' "best interest—to maximize the value of their relationship with us." (See pls.' exhibit 9, 1997 year in review.) Instead, Provident's vision had now broadened: "[Provident's]

vision is to enhance the quality of life of [its] policy-holders, clients and all our associates." Similarly, it was now "Provident Mutual's corporate mission to market high quality insurance, retirement and investment products that satisfy [its] customers['] needs for protection, asset accumulation and preservation of wealth over the course of a long-term relationship with the company." (*Id.*) Noticeably absent from Provident's new vision and mission statements are the words "ownership" and "participating policyholders." Participating policyholders' interests are now considered along with an array of other "stakeholders' " interests: employees, agents, management and the community. (See Notes of Testimony, March 16, 1999 at 92; see also, information statement at 18.) Presently, Provident considers participating policyholders contingent owners of the company; that is, they have the right to receive a portion of Provident's capital upon Provident's liquidation, dissolution or winding up. (*Id.* at 89-90.) Provident now views the right to receive dividends as a contractual right. (*Id.*) Provident's chief financial officer, John Neasey, characterized as "incomplete" and "simplistic" Provident's prior statement that policyowners are owners of the company and entitled to share in the profits of the company. (Notes of Testimony, June 22, 1999 at 82.) In fact, Mr. Neasey does not believe that it is his fiduciary duty to return profits to policyholders. (*Id.* at 121.)

Provident's plan of conversion illustrates that Provident no longer emphasizes participating policyholders' interests. The de-emphasis is evident in the board's approval of the mutual holding company structure despite Morgan Stanley's indication that full demutualization coupled with an initial public offering or merger with a

stock company was "strongly positive" for current policyholders, while demutualization through a mutual holding company structure was merely "positive" for current policyholders. (Pls.' exhibit 10 at 36; Provident Mutual board presentation August 1, 1996.) Further evidence that the mutual holding company structure de-emphasizes participating policyholders' interests is that the strategic advisory committee of Provident's board of directors cited as one of the "benefits" of the mutual holding company structure that Provident could avoid paying policyholders consideration for their interests in Provident. (Pls.' exhibit 5-K, April 24, 1996, minutes of strategic advisory committee meeting at 1.) Another example that Provident no longer emphasizes participating policyholders' interests is the mechanism Provident uses in the conversion to purportedly protect participating policyholders' interests: the closed block's use of the 1997 dividend scale. The 1997 dividend scale, which the closed block is designed to continue, neither reflects Provident's past practice of paying performance dividends nor addresses Mr. Hinkle's prior concern that a mechanism be in place to pay participating policyholders for their investments in nonparticipating lines. (Notes of Testimony, June 12, 1999 at 47, 63-64.) In addition, the closed block does not contain assets from nonparticipang lines of business; the board may exercise its discretion to use profits from these lines to pay closed block policyholders' dividends. (*Id.* at 63-64.) Furthermore, the closed block is not funded to maximize the participating policyholders' relationship with Provident. Instead, Provident funds the closed block "*just sufficiently* to pay all necessary benefits, dividends, expenses, and taxes charged to the closed block." (Information statement at exhibit H, closed block memorandum.)

## III. *Discussion of Law*

### A. Permanent Injunction

A court should issue a permanent injunction if "such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." *Soja v. Factoryville Sportsmen's Club,* 361 Pa. Super. 473, 479, 522 A.2d 1129, 1131 (1987). To issue a permanent injunction, the court is not required to find that imminent, irreparable harm is present. *Id.* at 481, 522 A.2d at 1133. Instead, a permanent injunction disposes of the merits of the case and attempts to permanently remedy the situation. *Id.* at 480-81, 522 A.2d at 1132. We conclude that Provident's directors breached their duty of disclosure because they disseminated a policyholder information statement which unfairly described the plan of conversion, and therefore prevented policyholders from making an informed vote on the plan. The only adequate remedy is to revise the information statement, redistribute the information statement containing the disclosures explained in this opinion and identified in the court's decree nisi, and to have the policyholders vote again on the plan of conversion.

### B. Dissenters' Rights

Defendants devote much of their argument against the applicability of dissenters' rights by arguing that dissenters' rights do not apply to Provident's conversion because it is not effectuated by a "share exchange" under 15 Pa.C.S. §1931(d).[7] Plaintiffs respond that Provident

7. Defendants also argue that dissenters' rights are not available under the other two sections cited by the plaintiffs: 15 Pa.C.S. §§2104(b)(3) and 1962(c).

used a share exchange to effectuate the plan of conversion under 15 Pa.C.S. §1931 because Provident described the process of conversion by stating that "Membership rights in Provident Mutual will be exchanged for membership rights in Provident Mutual Holding Company." Because Provident purportedly pursued a share exchange, plaintiffs argue that Provident must provide dissenters' rights pursuant to 15 Pa.C.S. §§1931(d) and 1571. The court need not decide that issue because we determined that even if section 1931(d) applied, Provident's policyholders do not receive dissenters' rights because, after the conversion, policyholders' membership rights in Provident Mutual Life Insurance Company are converted solely into membership rights in Provident Mutual Holding Company; therefore, the exceptions to dissenters' rights in section 1571(b)(1)(ii) apply.[8]

One finds the provision for dissenters' rights in 15 Pa.C.S. §1571(a):

"Except as otherwise provided in subsection (b), any shareholder of a business corporation shall have the right to dissent from, and to obtain payment of the fair value of his shares in the event of, any corporate action or to otherwise obtain fair value for his shares, where this part expressly provides that a shareholder shall have rights and remedies provided in this subchapter. See:

"Section 1931(d) (relating to dissenters' rights in share exchanges)."

---

8. We do not decide two issues: (1) whether Provident's plan of conversion complies with the Conversion Act; and (2) which provision of Pennsylvania's Business Corporation Law did Provident use to accomplish the conversion. Instead, we decide that dissenters' rights do not apply even if Provident's plan of conversion does not comply with the Conversion Act (and must therefore comply with certain provisions of Pennsylvania Corporation Law to be effectuated).

This provision applies to nonstock companies like Provident (*i.e.,* preconversion Provident) because under 15 Pa.C.S. §2101(c), the court substitutes "memberships" for "shares" or "shareholder."

The exceptions to section 1571 are found in section 1571(b):

"(1) Except as otherwise provided in paragraph (2), the holders of the shares of any class or series of shares, that at the record date fixed to determine the shareholders entitled to notice of and to vote at the meeting at which a plan specified in any of section . . . 1931(d) is to be voted on are either:

"(i) listed on a national securities exchange; or

"(ii) *held of record by more than 2,000 shareholders [members];* shall not have the right to obtain payment of the fair value of any such shares under this subchapter."

The clear intention of this section is to eliminate dissenters' rights with respect to listed or widely-held shares in certain fundamental transactions. Because there are over 2,000 members of Provident Mutual, section 1571 (b)(1)(ii) applies to Provident's plan of conversion.

Although this section applies, it does not end the court's inquiry because the BCL provides for dissenters' rights if the shares are not converted solely into shares of the acquiring corporation. Paragraph (2) of 1571(b) states:

"Paragraph (1) shall not apply to and dissenters' rights shall be available without regard to the exception provided in that paragraph in the case of:

"(i) Shares converted by a plan if the shares *are not* converted solely into shares of the acquiring, surviving, new or other corporation or solely into such shares and money in lieu of fractional shares." 15 Pa.C.S. §1571 (b)(2)(i). (emphasis added)

The plaintiff argues that the so-called "market exception" to dissenters' rights does not apply to Provident's transaction because the shares (memberships) are not exchanged solely for shares (memberships) of the acquiring corporation. The plaintiffs argue that Provident's conversion separates participating policyholders' membership interests by exchanging their membership in Provident Mutual Insurance Company for a policy in the stock insurer and a membership in the mutual holding company. Thus, plaintiffs argue "[u]pon conversion, the participating policyholders will receive membership rights in the mutual holding company which are divorced from their policies, and any ownership rights they have become diluted among all members—participating and nonparticipating policyholders alike." (Pls.' reply to defs.' further supp. mem. regarding dissenters' rights at 13.) The court finds that plaintiffs are not correct. Only the participating policyholders will be shareholders. The plan's use of a separate stock company to issue the insurance policy does not deprive the participating policyholders of their full membership rights in the new mutual holding company. The court concludes that the membership rights of the current members of Provident will be converted solely into membership rights in the new mutual holding company. Therefore, the exception in 15 Pa.C.S. §1571(b)(2)(i) does not apply, and the exception in 15 Pa.C.S. §1571(b)(1)(ii) applies, making dissenters' rights unavailable.

## C. Policyholder Information Statement Disclosures

Underlying the findings of fact is the court's conclusion (and its fundamental disagreement with Provident) that participating policyholders lose something by ap-

proving the plan of conversion: they forego the right to have their dividends paid from and policies secured by profits from nonparticipating lines of business, and they lose the priority they once received under the mutual insurance structure. The court does not challenge policyholders' prerogative to forego these rights by approving the plan of conversion or Provident's decision to pursue a corporate structure which limits those rights. However, the policyholder information statement must detail what policyholders forego and make certain that policyholders are properly informed. Accordingly, after discussing why the court is not deferring to the insurance department and after annunciating the disclosure standard the court will apply, the court will outline the deficiencies in the policyholder information statement and suggest ways to rectify those deficiencies.

The insurance department's approval of the policyholder information statement does not preclude this court from finding that the statement fails to disclose information that would enable the policyholders to make an informed decision on whether to approve or disapprove the plan. If plaintiffs are seeking relief for alleged torts arising out of an insurance company's corporate actions, jurisdiction lies with the court of common pleas. *Drain v. Covenant Life Insurance Co.,* 551 Pa. 570, 574, 712 A.2d 273, 277 (1998). To resolve allegations that an insurance company failed to disclose material information to policyholders before policyholders approved the insurance company's corporate actions, the court does not need to consider insurance laws, and thus can properly decide plaintiffs' claims. *Id.* at 578-79, 712 A.2d at 277. In addition, the court need not defer to the insurance department's decision to approve the policyholder in-

formation statement because "[t]he department has no particular expertise in matters of corporate action." *Id.* at 578, 712 A.2d at 277, citing *Trustees of the Presbytery v. Provident Mutual Life Insurance Co.,* 685 A.2d 635 (Pa. Commw. 1996) (quoting insurance commissioner's opinion dated September 28, 1994 at 7-8).

Here, plaintiffs allege that Provident's directors violated their duty of disclosure (candor) because they disseminated a policyholder information statement that "contain[ed] misrepresentations or omissions which are material to any decision by the members on how to vote . . . ." ( Pls.' compl. ¶101.) Plaintiffs challenge the propriety of Provident's corporate action by alleging that Provident's directors failed to disclose material information in the information statement. Because this claim does not involve the consideration of insurance laws, the court is not bound by the insurance department's approval of the policyholder information statement.

To enable policyholders to make an informed decision to approve the plan, the information statement must "*fairly* describe the proposed conversion plan." 40 P.S. 913-A-f. Because the Conversion Act does not define "fairly," the court will construe the word according to its common and approved usage. *MacElree v. Chester County,* 667 A.2d 1188 (Pa. Commw. 1995), *appeal denied,* 545 Pa. 666, 681 A.2d 180 (1996), *reconsideration denied; Commonwealth v. Lopez,* 444 Pa. Super. 206, 663 A.2d 746 (1995); see 1 Pa.C.S. §1903. The common and approved usage of "fair" is found in Black's Law Dictionary: "Having the qualities of impartiality and honesty; free from prejudice, favoritism, and self-interest. Just; equitable; even-handed; equal as between conflicting interests." Black's Law Dictionary, 5th ed. at 535

(West Publishing). The court accepts this definition and is not persuaded by the decision in *Pincus v. The Mutual Assurance Co.,* March term 1973, no. 4604 (Phila. C.P., Oct. 29, 1979). In *Pincus,* the parties asked the court to decide whether defendant's failure to disclose certain information in its proxy statement constituted fraud. *Id.* at 1. *Pincus* does not stand for the broad proposition that any disclosure is fair as long as it is not fraudulent. A statement can be non-fraudulent but still be unfair. Therefore, to fairly describe the proposed conversion, the information statement must not generalize the risks of the plan while specifying its benefits, must not omit information needed to give a balanced discussion to critical components of the plan, and must not fail to explain certain important words and phrases. The court finds that the information statement Provident provided to policyholders did all those things.

## 1. *Closed block*

The statement in the policyholder information statement that "[t]he purpose of the closed block is to provide reasonable assurance to holders of policies included in the closed block that their policy dividend expectations will be protected after the effective date" is misleading because the information statement does not state that the 1997 dividend scale neither factors in profits from nonparticipating lines of business nor provides a mechanism to repay participating policyholders for their prior investment in nonparticipating lines of business. (See policyholder information statement at 32.) Expectations are formed from experiences. From 1987 to 1991, participating policyholders experienced a dividend which included profits from nonparticipating lines of business.

(Pls.' exhibit 13, 18.) Provident paid performance dividends because it believed that "the profits (and losses) from the nonparticipating lines of business are considered to belong to the participating policyholders." (Pls.' exhibit 19 at 1.) Thus, the right to receive profits from nonparticipating lines of business was an "incident of ownership" that policyholders justifiably expected. The 1997 dividend scale does not include a component to pay dividends from the profits of nonparticipating lines and does not include a mechanism for participating policyholders to obtain the benefit of their prior investment in those lines.[9] (Notes of Testimony, June 22, 1999 at 47, 64; Notes of Testimony, March 16, 1999 at 328, 333.) Therefore, the statement that the closed block provides "reasonable assurance to policyholders that their dividend expectations will be protected" is misleading because the 1997 dividend scale does not include a component for performance dividends, a benefit policyholders could reasonably expect to receive based on Provident's past practice.

Provident's statement is not made less misleading by its other statement in the policyholder information state-

---

9. Provident did not inform PriceWaterhouse Coopers, the accounting firm that structured the closed block, about Provident's past practice of paying performance dividends to participating policyholders. (Notes of Testimony, June 22, 1999 at 49; Notes of Testimony, March 16, 1999 at 330.) Kenneth Beck, the partner at PriceWaterhouse Coopers who helped design the closed block, admitted that if he had known about Provident's past practice of paying performance dividends, that information could have influenced how PriceWaterhouse Coopers ultimately structured the closed block. (Notes of Testimony, March 16, 1999 at 322-23.) However, Mr. Beck quickly added that the design of the closed block could depend on other factors besides the payment of performance dividends. (*Id.*)

ment that the stock life insurance company could choose to pay dividends from its general funds. Nor is the statement any less misleading merely because, after conversion, Provident can use profits from non-closed block businesses to fund closed block policyholders' dividends. What was once a "practice" under the mutual insurance structure becomes merely a "possibility" under the mutual holding company form. Policyholders will be aware of this distinction if the information statement discloses that the 1997 dividend scale neither includes a component for performance dividends nor contains a mechanism to refund policyholders for their prior investment in Provident's growth.

Therefore, the information statement should state that Provident stopped paying performance dividends, that the 1997 scale does not include a component to pay dividends from profits from nonparticipating lines of business, and that the closed block is not calculated to refund policyholders' prior investment in Provident's growth. By adding these disclosures, the policyholder information statement will better explain—and thus help policyholders to better understand—the information statement's important phrase that "the purpose of the closed block is to provide reasonable assurance . . . that [participating policyholders] dividend expectations will be protected . . . ." (Information statement at 22.)

## 2. *Full demutualization*

The policyholder information statement gives an unbalanced discussion of full demutualization because it does not state that Morgan Stanley, in a document titled "Summary of the key long-term competitiveness factors

addressed and possible implications," indicated that full demutualization coupled with an IPO or merger with a stock company was "strongly positive" for current policyholders and that the mutual holding company structure was "positive." The information statement should divulge this to enable the policyholders to determine whether the mutual holding company structure is in their best interests. The information statement asserts that "[i]n a demutualization policyholders/members receive an immediate benefit from the accumulated earnings of the former insurer." (Policyholder information statement at 26.) Gary Parr, the Morgan Stanley partner who helped prepare Morgan Stanley's "fairness opinion," which concluded that the mutual holding company structure was financially fair to policyholders, explained the different ratings by testifying that some policyholders view as "better" the ability of Provident to immediately deliver value to policyholders. (Notes of Testimony, March 16, 1999 at 204.) Although Mr. Parr did not believe that the alternatives to the mutual holding company structure gave policyholders "maximum" value, he testified that "there are those people that would suggest that [delivering] something is better than delivering nothing." (*Id.*) The court agrees. Therefore, the information statement should include the summary Morgan Stanley prepared which indicated that a full demutualization coupled with a merger with a stock company or initial public offering was "strongly positive" for current policyholders. Including the summary with the information statement will enable current policyholders to evaluate fairly the board's conclusion that Provident's conversion serves policyowners' best interests.

### 3. *Conflict of interest*

The information statement inadequately identifies and explains the potential conflicts of interest between shareholders of the stock life insurance company and members of the mutual holding company. The information statement states that "the short-term and long-term interests of any public shareholders may at times conflict with interests of the members of Provident Mutual Holding Company, who will also generally be the policyholders of Prov*first* Life. The plan of conversion contains structures such as the closed block, and procedures designed to address such conflicts but there can be no assurance that such structures and procedures will be effective or that management and directors will be able to reconcile the interests of members with the interests of public shareholders." (Information statement at 18.)

Noticeably absent from the information statement is any discussion identifying specific areas where Provident directors' duties to policyholders and shareholders potentially conflict. For example, after conversion, the board of directors must carefully balance the policyholders' interest in receiving insurance at cost with the shareholders' interest in receiving the highest return on their investment. A further conflict arises over how the directors will apportion the growth of and profits from the stock life insurance company between shareholders and policyholders. Current policyholders should be concerned about whether they will share in profits earned by the stock life insurance company, or instead, whether the stock life insurance company's earnings will inure only to its shareholders. Current policyholders should be particularly concerned about how the mutual holding

company's directors will balance shareholders' and policyholders' interests since the directors of the mutual holding company, through the employee stock ownership plan and through possible stock options, will also be shareholders and likely directors of the stock life insurance company.[10] (See information statement at 37.) Current policyholders are justifiably concerned that the closed block circumscribes their right to benefit from the stock life insurance company's growth and profits. Thus, to reasonably inform policyholders about the plan, the policyholder information statement should not only identify these potential conflicts but also explain—with specifics and not with generalities—how the plan's structures and procedures mitigate these conflicts.

Any discussion of conflicts of interest is incomplete without disclosing information about the nature and extent of policyholders' control of the mutual holding company and without explaining that Provident cannot be acquired in a hostile takeover. Stating in a general and

---

10. Provident officers' ability under the mutual holding company structure to receive equity compensation, by owning shares of the stock life insurance company and by receiving stock options, illustrates a fundamental difference between Provident's current corporate structure and the mutual holding company form. Before conversion, it was difficult for policyholders to control the mutual insurer, because to nominate members to the board, policyholders were required to get approval from the greater of 7,500 members or 2.5 percent of the members of Provident. After conversion, the voting requirement remains intact but the board now receives equity compensation through the ESOP and potential stock options. Thus, the mutual holding company form combines the entrenchment feature of a traditional mutual insurer with the potentially lucrative compensation feature of a stock company. Corporate officers' ability to be entrenched and enriched under the mutual holding company form is a risk that should be disclosed to policyholders.

cursory fashion that Provident's policyholders have over-all control of the enterprise, without specifying the means policyholders have to exercise that control (*i.e.* nominations to board requires the greater of 7,500 members or 2.5 percent of the corporation), is not sufficient. Therefore, the information statement must state that Provident cannot be acquired in a hostile takeover and then explain how policyholders may exercise control of the mutual holding company.

Although the conflicts are potential, they still must be disclosed to give policyholders a fair and complete presentation of the plan. The policyholder information statement does not fairly present the plan if it specifies and expounds upon the plan's benefits and generalizes or omits the plan's risks. That the board believes the benefits are more likely to occur than the risks does not eliminate their duty to present the benefits and risks equally. Accordingly, the information statement must specifically identify the potential conflicts of interest and explain how Provident will rectify those conflicts.

### 4. *Morgan Stanley and the fairness opinion*

In preliminarily enjoining Provident's plan of conversion, this court found that the information statement failed to disclose the material factors Morgan Stanley relied upon in rendering its fairness opinion and omitted information about why Provident did not ask Morgan Stanley to compare Provident's plan with other demutualization alternatives to the mutual holding company structure. Our present decision to require Provident to include the summary of key long-term factors addressed, satisfies the court's prior concerns about Morgan Stanley's fairness opinion. Additionally, we will require Provident to dis-

close the compensation and contingency arrangement it has with Morgan Stanley.

## IV. *Conclusions of Law*

(1) Current policyholders of Provident Mutual Life Insurance Company are not entitled to dissenters' rights under 15 Pa.C.S. §1571(a) because the exceptions to dissenters' rights provided in 15 Pa.C.S. §1571(b)(1)(ii) applies and 15 Pa.C.S. §1571(b)(2)(i) does not apply.

(2) The officers of Provident Mutual breached their duty of disclosure because the policyholder information statement they disseminated unfairly describes the plan of conversion and thus prevented policyholders from making an informed vote on the plan.

## DECREE NISI

And now September 16, 1999 having considered plaintiffs' motion for permanent injunction, all responses thereto, and after a full hearing on the merits of plaintiffs' motion on June 22, 1999, the court enters the following decree nisi:

(1) Provident Mutual Life Insurance Company is permanently enjoined from effectuating its plan of conversion until it:

(A) Revises and disseminates to current policyholders a policyholder information statement which discloses:

"That the dividends participating policyholders once received contained profits from nonparticipating lines of business.

"That the 1997 dividend scale does not include a dividend calculation component which includes profits from nonparticipating lines of business.

"That the 1997 dividend scale is not calculated to refund participating policyholders for their prior investment in nonparticipating lines of business.

"The summary of the key long-term competitiveness factors addressed and possible implications, prepared by Morgan Stanley and PriceWaterhouse Coopers.

"The specific conflicts of interest raised by the mutual holding company structure.

"How Provident intends to rectify those conflicts of interest.

"That Provident cannot be acquired in a hostile takeover.

"The procedure policyholders must use to elect the board of directors.

"Under risks of conversion, that before conversion, Provident officers' compensation package did not include ownership interests in Provident, but after conversion, their compensation arrangement will likely include ownership interests in the form of the ESOP and stock options.

"The compensation and contingency arrangement Provident has with Morgan Stanley."

(B) Submits the plan to voting policyholders after the policyholder information statement containing the aforementioned disclosures is distributed.

(C) Re-solicits proxies for policyholders to vote on the plan.

(D) Conducts a special meeting where policyholders may vote on the plan of conversion.

(2) The parties may file motions for post-trial (adjudication) relief to affirm, modify or change the decree nisi within 15 days of the date of this order. Pa.R.C.P. 227.1(a)(4) and Pa.R.C.P. 227.1(c)(2).